**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **AJFJ TRANSPORT CORPORATION, dba AJFJ TRANSPORT, and JASHMEN SINGH BRAR**,<br><br>Plaintiffs,<br><br>v.<br><br>**GIVENS TRANSPORTATION SOLUTIONS, LC, and CONNOR KILPATRICK**,<br><br>Defendants. | Civil Action No.: 26-cv-1050<br><br>**TRIAL BY JURY DEMANDED** |

## VERIFIED COMPLAINT

COMES NOW, Plaintiffs AJFJ Transport Corporation d/b/a AJFJ Transport ("AJFJ") and Jashmeen Singh Brar ("Brar"; collectively, "Plaintiffs"), by and through undersigned counsel, and move this Honorable Court for judgment against Defendants Givens Transportation Solutions, LC ("GTS") and Connor Kilpatrick ("Kilpatrick"; collectively, "Defendants"), on the grounds and for the relief set forth below:

### Summary of the Action

1. This is an action for defamation *per se*, tortious interference with business relationships and expectancies, vicarious liability, and injunctive relief arising from a FreightGuard report that Defendants caused to be published on Carrier411.com against AJFJ and that expressly identified Brar by name.

2. On October 15, 2025, Kilpatrick, a Director of Operations and Senior Account Manager for GTS, published a FreightGuard report accusing AJFJ and Brar of "HELD LOAD HOSTAGE," "IN-TRANSIT AGREEMENT MODIFICATION," and "UNETHICAL OR DECEPTIVE

BUSINESS PRACTICES." In the narrative accompanying the report, Kilpatrick asserted that Brar demanded additional money "BEFORE FINISHING HIS ROUND TRIP DELIVERY (HELD LOAD HOSTAGE)."

3. Those factual accusations were false. AJFJ had transported the freight from Newark, New Jersey to Maine, had arrived at the delivery site, and the shipment was actively being unloaded while the parties disputed additional detention and accessorial compensation. AJFJ did not stop the unloading, did not refuse to deliver the cargo, and did not condition release of the cargo on additional payment.

4. The contemporaneous written record is particularly significant. Before the FreightGuard was ever published, Brar expressly told Kilpatrick in writing that the freight "was being unloaded," that "none of the freight shipment was halted," and that he had never stated anything remotely resembling an intent to hold the freight hostage. Kilpatrick nevertheless threatened to file a FreightGuard report and even threatened to call the police if Brar continued to seek additional compensation.

5. GTS then issued an updated written rate confirmation increasing AJFJ's compensation from $3,750.00 to $4,150.00, including detention and additional cost. AJFJ signed and returned that rate confirmation. Five days later, GTS unilaterally deducted the same $400.00 and Kilpatrick published the threatened FreightGuard report.

6. The report was not an inconsequential internet review. Carrier411 markets FreightGuard reports as carrier-vetting information used by freight brokers and shippers in deciding whether a carrier is safe to use. A FreightGuard accusation that a carrier "held load hostage" strikes directly at the carrier's honesty, integrity, reliability, and fitness to operate in the trucking industry.

7. The report has caused concrete and continuing business harm. AJFJ has documented at least $37,300.00 in specific denied load opportunities, plus $270.00 in permit-related expense, and has identified broader lost revenue substantially exceeding $75,000.00. Plaintiffs continue to lose business because brokers reviewing AJFJ's MC number encounter the FreightGuard report and disqualify or decline AJFJ.

**The Parties**

8. Plaintiff AJFJ Transport Corporation is a corporation that operates under the trade name AJFJ Transport and maintains its principal place of business at 1004 Blue Heron Court, Forney, Texas 75126. AJFJ is incorporated under the laws of the State of New Jersey. AJFJ operates as an interstate motor carrier under USDOT No. 2778371 and MC No. 924738. AJFJ is a small family-operated trucking company. It has operated interstate authority since approximately 2015 and, at the time of the events at issue, had spent more than a decade building relationships with freight brokers and shippers throughout the United States.

9. Plaintiff Jashmeen Singh Brar is an individual and citizen of Texas who resides in Forney, Texas. Brar is an officer and Operations Manager of AJFJ and personally dispatched the shipment at issue. The challenged FreightGuard report identifies Brar by name as the "DRIVER, DISPATCHER" and directly accuses him of the misconduct described herein.

10. Defendant Givens Transportation Solutions, LC is a limited liability company and federally authorized property broker operating under MC No. 182974. GTS identifies 1720 S. Military Highway, Chesapeake, Virginia 23320 as its official federal physical address and its billing address. GTS conducts freight-brokerage operations and arranges transportation between shippers, receivers, and interstate motor carriers such as AJFJ. GTS also maintains a brokerage sales office in the greater Charlotte/Fort Mill area.

11. Defendant Connor Kilpatrick is an individual who, upon information and belief, is a citizen of South Carolina. At all relevant times, Kilpatrick was employed by and acted as an agent of GTS, holding himself out as GTS's "Director of Operations" and "Senior Account Manager." At all relevant times, Kilpatrick was acting within the course and scope of his employment and agency for GTS when he negotiated with AJFJ, administered the shipment, authorized or requested changes to AJFJ's compensation, threatened the FreightGuard report, and ultimately submitted the FreightGuard report under GTS's name and Carrier411 account.

## **Jurisdiction and Venue**

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. AJFJ is a citizen of New Jersey, its state of incorporation, and Texas, where it maintains its principal place of business and its members reside. Brar is a citizen of Texas. Kilpatrick is, upon information and belief, a citizen of South Carolina. GTS is a limited liability company. Upon information and belief, based on GTS's public identification of the partners who formed and own its brokerage operation, GTS's members are Chris Reed, Beau Whitenack, and Justin McNinch. Reed and McNinch are citizens of South Carolina, and Whitenack is a citizen of North Carolina. No member of GTS is a citizen of New Jersey or Texas. Plaintiffs will promptly amend or supplement these jurisdictional allegations if GTS's disclosure under Fed. R. Civ. P. 7.1 identifies any additional member or different citizenship information.

13. The amount in controversy requirement is satisfied independently by AJFJ's ongoing actual business losses and reputational damages, which exceed $75,000.00. In addition, Plaintiffs seek

presumed and general damages available for defamation *per se* and punitive damages based upon Defendants' knowing and malicious publication of false statements.

14. This Court has personal jurisdiction over GTS because GTS maintains its official federal physical address and billing address in Chesapeake, Virginia, regularly transacts business in Virginia, purposefully avails itself of the privileges and protections of Virginia law, and agreed in its Broker/Carrier Agreement that Virginia law governs disputes arising from its carrier relationships and that such disputes are to be submitted to a court of proper jurisdiction in Virginia.

15. This Court has personal jurisdiction over Kilpatrick pursuant to Fed. R. Civ. P. 4(k)(1)(A) and Va. Code § 8.01-328.1 because Kilpatrick purposefully transacted GTS's brokerage business as a senior operational employee and agent of GTS, administered the AJFJ relationship on GTS's behalf, invoked and exercised GTS's federally registered broker authority, directed GTS personnel concerning compensation and payment, and committed the tortious conduct alleged herein in the course of that agency. The dispute arises directly from those contacts and from a broker-carrier relationship that GTS expressly made subject to Virginia law and a Virginia forum.

16. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims were undertaken through or are attributable to GTS's Virginia-centered corporate and billing operations, including GTS's payment obligations on the carrier transaction and its continuing corporate responsibility for a FreightGuard publication submitted in GTS's name and maintained after notice of its alleged falsity.

17. Venue is proper in the Norfolk Division under Local Civil Rules 3(B)(3) and (C) because Chesapeake, Virginia is within the Norfolk Division and GTS maintains its official federal physical and billing address there.

18. Plaintiffs' records reflect that the broker-carrier relationship between AJFJ and GTS was subject to GTS's Broker/Carrier Agreement. That agreement identifies GTS at its Chesapeake, Virginia address, selects Virginia law for any disagreement or dispute, and provides that disputes are to be submitted to a court of proper jurisdiction in Virginia. Those provisions further confirm GTS's purposeful Virginia contacts and its expectation that disputes arising from its carrier relationships may be litigated in Virginia. Kilpatrick's alleged conduct was undertaken solely in his role administering that same GTS carrier relationship and is closely related to the contractual relationship and dispute.

19. The challenged FreightGuard report was first published on October 15, 2025. This action is filed within one year of that publication and is timely under the applicable limitations period, including Va. Code § 8.01-247.1.

## STATEMENT OF FACTS

### AJFJ Had an Established Business and Professional Reputation

20. AJFJ operates as an interstate motor carrier that depends upon repeat and prospective freight-broker relationships to keep its equipment moving and generate revenue. Freight opportunities are time-sensitive, and a carrier must frequently be approved by a broker within minutes in order to secure a load.

21. AJFJ had been operating under its federal motor-carrier authority for approximately ten years before the events at issue. Brar represented to GTS and other brokers that AJFJ had zero cargo claims and had developed a reputation for successfully transporting interstate freight.

22. AJFJ's ability to obtain new loads depends heavily on its MC number and the electronic vetting systems used by brokers. An accusation that AJFJ holds freight hostage or engages in deceptive business practices is therefore uniquely damaging to its business.

**GTS Booked AJFJ for Load No. 40035823**

23. On or about October 9, 2025, GTS, through Kilpatrick, engaged AJFJ to transport Load No. 40035823. The original written rate confirmation reflected a carrier freight pay of $3,750.00.

24. The original rate confirmation identified the shipment as weighing approximately 44,929 pounds and consisting of 584 pieces. It identified pickup at 250 Port Street in Newark, New Jersey and delivery at 68 Jordan River Road in Trenton, Maine.

25. The original rate confirmation further stated: "Driver Load: No driver loading or unload," confirming that the receiver - not Plaintiffs - would be responsible for the physical unloading operation at destination.

26. AJFJ accepted the load, AJFJ traveled to Newark, and on October 9, 2025, Brar advised GTS that AJFJ was loaded and rolling. The parties communicated throughout the movement of the freight.

**GTS Changed the Delivery Instructions and Directed Brar to an Unusual Jobsite**

27. The delivery location and method were not as straightforward as the original rate confirmation suggested. On the evening of October 9, Kilpatrick advised Brar by email that delivery was instead "set up" for 7:30-8:00 a.m. at 218 Downeast Highway, Ellsworth, Maine, where AJFJ would be "escorted from Facility to final delivery location."

28. Before arrival, Brar had specifically asked GTS what type of unloading environment he should expect - "Crew warehouse jobsite?" - demonstrating that the final delivery circumstances had not been clearly disclosed in the original rate confirmation.

29. AJFJ arrived in Maine early on October 10 and advised GTS at approximately 3:33 a.m. that it was "On site." Later that morning, Brar confirmed he was "With the crew."

30. The final delivery was a residential/rural jobsite that was not ordinarily configured to receive a tractor-trailer carrying an intermodal container. Contemporaneous photographs show a narrow, soft and rutted access area adjacent to a two-lane road, a residential structure, and trees and other obstacles in close proximity to the route required for the tractor-trailer.

31. The photographs further show the tractor-trailer and Hapag-Lloyd container positioned on a narrow dirt/gravel path with limited clearance, as well as significant tire ruts and disturbed ground at the roadway entrance. The conditions materially differed from a normal commercial warehouse or paved receiving facility.

**AJFJ Completed the Delivery Despite the Difficult Conditions and Equipment Damage**

32. AJFJ did not abandon the load when confronted with the delivery conditions. Instead, it worked with the receiving/construction crew to maneuver and stage the tractor-trailer so that the freight could be unloaded.

33. The maneuvering took approximately 30 to 45 minutes. Brar reports that the clutch overheated multiple times and that the receiver's crew used a forklift to assist with positioning the equipment.

34. During that process, a mud flap assembly on the rented trailer was damaged. A contemporaneous photograph depicts the bent/damaged mud flap assembly. AJFJ later incurred approximately $450.00 to address the damage. AJFJ also allowed the receiver's crew to use some of its own tools to complete the work. At approximately 11:06 a.m. on October 10, Brar contemporaneously emailed GTS: "Im letting them use some of my tools as well lol."

35. The delivery and unloading process lasted for hours. AJFJ estimates it was at the delivery location for approximately seven hours, during which AJFJ's tractor, trailer, and driver were unavailable for other revenue-producing work.

36. The cargo nevertheless reached its intended destination and was placed with the receiving crew. At no time did Plaintiffs drive away with the cargo, sequester it, direct the receiver to stop unloading, or use possession of the freight itself as leverage for payment.

**GTS Acknowledged Detention and Agreed that Additional Compensation Was Appropriate**

37. As the delivery delays continued, GTS itself acknowledged that AJFJ was entitled to additional compensation. At approximately 11:27 a.m. on October 10, Kilpatrick instructed Brar to keep track of detention and wrote: "We pay $50 an hour after 2h free."

38. In the same email, Kilpatrick thanked Brar for helping at the difficult jobsite and offered additional compensation: "I'll also give you $100 out of my own pocket for this." He instructed GTS employee Sean Reed ("Reed") to add the amount to the rate confirmation after completion.

39. At approximately 11:44 a.m., Reed told Brar that an updated rate confirmation would follow. At approximately 12:06 p.m., Kilpatrick again instructed Reed to "send an additional $250 on the rate con" including detention.

40. At approximately 12:21 p.m., Reed confirmed in writing: "Pending POD, Will Add $250 on RC." Thus, GTS was not merely confronting a unilateral demand by AJFJ; GTS was actively negotiating and approving additional compensation based on the actual conditions encountered at delivery.

41. Brar requested that the approved compensation be memorialized on the rate confirmation before the receiver completed unloading. That request did not stop the unloading. The freight remained at destination and the receiver's crew continued unloading throughout the compensation discussion.

42. As the parties continued to quantify detention, damaged equipment, use of tools, and the additional work required, Brar requested $200.00 in detention and $250.00 for the receiver's lack

of preparedness. He later proposed resolving all additional compensation for $400.00 above the original rate.

**<u>Kilpatrick Manufactured a "Hostage" Narrative During the Compensation Dispute</u>**

43. Rather than treat the matter as an ordinary dispute over detention and accessorial compensation, Kilpatrick became confrontational. He repeatedly accused Brar of lying and characterized the negotiations as an "in-transit modification" even though the freight had reached the delivery location and was in the process of being unloaded.

44. At approximately 3:33 p.m. on October 10, Kilpatrick introduced the phrase "holding freight hostage" himself, asking Brar rhetorically: "Are you going to add on - holding freight hostage next if I don't agree to your demands?"

45. Kilpatrick then threatened a FreightGuard report if Brar continued to pursue the additional compensation: "If you want more money that's out of our original agreement I'll send it but I'm also going to freight guard report you and tell everyone else what I experienced with you."

46. Kilpatrick further presented AJFJ with an ultimatum: accept less additional compensation or take the additional money and receive a FreightGuard report. This threat expressly linked the prospective publication to the compensation dispute.

47. Brar immediately rejected the "hostage" accusation in writing. At approximately 3:58 p.m., he wrote that Kilpatrick had threatened to call police for "holding the freight hostage" even though Brar "NEVER said anything" remotely like that.

48. Brar further explained in the same written communication: "The freight was being unloaded with you now having the delivery paperwork as well. The freight wasn't in transit, it was received and actively being unloaded. None of the freight shipment was halted over anything on my end."

49. This written denial put Kilpatrick and GTS on direct notice - before any FreightGuard publication - that Brar disputed the factual premise that he had withheld cargo or conditioned delivery of cargo upon payment.

50. Kilpatrick nevertheless escalated the threat. At approximately 4:32 p.m., he wrote that if Brar engaged in "in-transit modifications or holding my freight hostage," he would report AJFJ to Carrier411 and, "depending on how far you want to take it," call "the police 911."

51. Kilpatrick then demanded that Brar tell him what would happen if GTS did not pay the requested additional compensation "so I can freight guard report you and send the money already." The statement demonstrates that Kilpatrick was actively attempting to create a factual predicate for the report he had already threatened to publish.

52. Kilpatrick's emails also contained personal and hostile language, accusing Brar of attacking his family, attempting to take food off his family's plate, and telling Brar to "hurry up, what the f*** do you want?" The tenor and timing of these communications support the inference that the eventual FreightGuard was retaliatory rather than a neutral carrier-performance report.

**The Cargo Was Delivered;**
**The Remaining Dispute Concerned Compensation and the Empty Container Return**

53. By the later stages of the October 10 email exchange, the freight was at destination and had been or was being unloaded. The remaining operational issue concerned the empty container and its return to the Newark area after delivery.

54. AJFJ disputed whether the original paperwork adequately documented the empty-container return as a separate leg. It nevertheless transported the empty container back toward Newark after the cargo had been delivered. AJFJ attempted to return the empty container on Saturday afternoon but reports that the Newark location would not accept the return when it arrived. It retained the equipment and returned again the next business day to complete the return.

55. The empty-container issue did not transform the previously delivered cargo into freight being "held hostage." The cargo itself was no longer in AJFJ's possession as leverage during the return dispute.

**GTS Issued and AJFJ Accepted a Written $4,150.00 Rate Confirmation**

56. At approximately 5:08 p.m. on October 10, Kilpatrick instructed Reed to add another $150.00 to the previously approved $250.00 - a total increase of $400.00 - notwithstanding Kilpatrick's continuing accusations.

57. GTS then issued an updated written rate confirmation dated October 10, 2025. The updated rate confirmation changed the delivery information to 218 Downeast Highway, Ellsworth, Maine and expressly listed: carrier freight pay of $3,750.00; detention time of $250.00; additional cost of $150.00; and total carrier pay of $4,150.00.

58. AJFJ signed and returned the updated rate confirmation to GTS at approximately 5:23 p.m. on October 10. GTS acknowledged receipt. This written agreement is irreconcilable with the later suggestion that Brar or AJFJ simply extorted or unilaterally imposed $500.00 in additional compensation.

59. The updated rate confirmation also confirms that the final additional compensation was $400.00, not the $500.00 later stated in Kilpatrick's FreightGuard narrative.

**Five Days Later GTS Reversed the $400.00 and Kilpatrick Published the Threatened FreightGuard**

60. On October 15, 2025, five days after GTS issued the $4,150.00 written rate confirmation, Kilpatrick announced that GTS would deduct $400.00 from AJFJ's invoice and revert to the original $3,750.00 rate.

61. Kilpatrick claimed the deduction was based on the same narrative he had threatened to place on Carrier411, including "Held load hostage," "In-transit modification/agreement to rate,"

and "Deceptive and unethical business practices." He also asserted disputes concerning the tarp and timing of the empty-container return.

62. The deduction was communicated not only to Brar but internally to GTS payables and other GTS personnel, evidencing corporate knowledge of and participation in the position Kilpatrick was taking against AJFJ.

63. On the same date, October 15, 2025, Kilpatrick used GTS's Carrier411 access to submit FreightGuard Report FG174914 against AJFJ. Carrier411 immediately emailed notice of the report to AJFJ and copied a GTS email address.

64. The report identified the reported company as "AJFJ TRANSPORT CORPORATION DBA AJFJ TRANSPORT," MC924738, and identified the submitter as "CONNOR KILPATRICK" of "GIVENS TRANSPORTATION SOLUTIONS, LLC," as shown below:



Carrier411 - FreightGuard Report - Google Chrome

carrier411.com/manager/viewratingpop.cfm?rid=174914&aid=13042

FREIGHTGUARD REPORT

REPORT FG174914 SUBMITTED OCTOBER 15, 2025 12:41 PM EST

THE FOLLOWING REPORT DOES NOT NECESSARILY REFLECT THE OPINIONS OF CARRIER411. WE DO NOT ENCOURAGE OR DISCOURAGE YOU FROM CONDUCTING BUSINESS WITH THIS OR ANY OTHER COMPANY. USE YOUR OWN INDEPENDENT JUDGMENT WHEN MAKING HIRING DECISIONS.

REPORTED COMPANY
AJFJ TRANSPORT CORPORATION
DBA AJFJ TRANSPORT
1004 BLUE HERON COURT
FORNEY, TX 75126
DOCKET: MC924738
PHONE: (201) 478-2322
FAX: (201) 478-2322
EMAIL: AJFJTRANS@GMAIL.COM

REPORT SUBMITTED BY
CONNOR KILPATRICK
GIVENS TRANSPORTATION SOLUTIONS, LLC
600 TOWNE CENTRE BLVD, 404
PINEVILLE, NC 28134
PHONE: (704) 980-0085
FAX: (704) 980-0303
EMAIL: BWHITENACK@GIVENSTS.COM
FGID:2A31C2510200D260843620D6443A677B

REPORTED ITEMS
HELD LOAD HOSTAGE
IN-TRANSIT AGREEMENT MODIFICATION
UNETHICAL OR DECEPTIVE BUSINESS PRACTICES

REPORTED COMMENTS
DRIVER, DISPATCHER JASH BRAR GOT TO DELIVERY, ALLEGEDLY MESSED UP ONE OF HIS MUD FLAPS AND DEMANDED I SEND HIM EXTRA $500 ON THE RATE CON. IN-TRANSIT AGREEMENT MODIFICATION BEFORE FINISHING HIS ROUND TRIP DELIVERY. HELD LOAD HOSTAGE. HE SAID THIS WAS JUSTIFIED BY THE "LACK OF PREPAREDNESS" OF THE RECEIVER, WHATEVER THE HELL THAT MEANS. HE ALSO FAILED TO RE-TARP THE OPEN TOP, WHICH RESULTED IN AN ADDITIONAL $250 LOSS. THIS CARRIER WAS BY FAR ONE OF THE WORST CARRIERS I'VE EVER ENCOUNTERED.

RESPONSE FROM REPORTED COMPANY
OCTOBER 15, 2025 1:11 PM EST
RECEIVER'S NARROW, UNPREPARED DRIVEWAY CAUSED TRUCK TO GET STUCK, BREAKING MUDFLAP/OVERHEATING THE CLUTCH. I RESOLVED IT QUICKLY TO AVOID A $4K TOW. BROKER WAS UNREACHABLE BEFORE ARRIVAL, LATER DENIED $400 COMPENSATION FOR 6 HRS DETENTION, DAMAGES, AND TOOLS, AND FAILED TO SEND A RETURN RATE CONFIRMATION. RETARPING THE CONTAINER WAS THE CREW'S DUTY, NOT THE DRIVER'S, AND THE RATE CONFIRMATION LACKED ANY CARRIER RESPONSIBILITY DETAILS. NOT HOSTAGE, NEGATIVE GP. 68 JORDAN RIVER ROAD TRENTON, ME
JASH BRAR

PRINT REPORT CLOSE WINDOW COPYRIGHT © 2025 CARRIER411 SERVICES, INC.

**The FreightGuard Contains False Statements of Fact**

65. The report selected and published the following factual categories against AJFJ:

a. "HELD LOAD HOSTAGE";

b. "IN-TRANSIT AGREEMENT MODIFICATION"; and

c. "UNETHICAL OR DECEPTIVE BUSINESS PRACTICES."

66. Kilpatrick then published the following narrative concerning Brar: "DRIVER, DISPATCHER JASH BRAR GOT TO DELIVERY, ALLEDGELY MESSED UP ONE OF HIS MUD FLAPS AND DEMANDED I SEND HIM EXTRA $500 ON THE RATE CON (IN-TRANSIT AGREEMENT/MODIFICATION) BEFORE FINISHING HIS ROUND TRIP DELIVERY (HELD LOAD HOSTAGE)."

67. Kilpatrick further published that Brar justified the request based on the receiver's "LACK OF PREPAREDNESS," adding "WHATEVER THE HELL THAT MEANS," and asserted that AJFJ failed to re-tarp the open top and caused an additional $250.00 loss.

68. The report concluded: "THIS CARRIER WAS BY FAR ONE OF THE WORST CARRIERS I'VE EVER ENCOUNTERED. DNU." Plaintiffs do not base their defamation claim on this final subjective opinion standing alone; their claims arise from the specific false factual accusations and categories that precede and purport to justify that opinion.

**The "Held Load Hostage" Accusation Is False**

69. The statement that Brar or AJFJ "held load hostage" is false. The cargo was transported to Maine and was at the receiver's location while the parties were discussing detention and accessorial compensation. Brar did not tell Kilpatrick that AJFJ would refuse to deliver the cargo unless paid additional money. Kilpatrick cannot identify any written statement in which Brar said that because no such statement exists.

70. The contemporaneous emails establish the opposite. Before publication, Brar expressly told Kilpatrick that the freight was received, actively being unloaded, and that none of the freight shipment had been halted.

71. Kilpatrick knew that the receiver's crew was unloading the shipment because GTS was communicating with Brar during the unloading, requesting the POD, calculating detention, and issuing a revised rate confirmation while the delivery was being completed.

72. Kilpatrick himself introduced the concept of "holding freight hostage" as a threatened future accusation during the negotiation. He then repeated the accusation on Carrier411 after Brar refused to abandon the compensation dispute.

73. The words "held load hostage" are particularly damaging in the trucking industry because they convey that a carrier intentionally withholds cargo entrusted to it and uses the cargo as leverage to extract payment. Such an accusation attacks the carrier's honesty, trustworthiness, and fitness to be entrusted with customers' freight.

**The Report Falsely Mischaracterizes the Compensation Negotiation**

74. The report falsely states that Brar demanded "EXTRA $500" before finishing the round trip. The final negotiated increase was $400.00, and GTS itself issued a written rate confirmation accepting that $400.00 increase.

75. The negotiation did not occur in a vacuum. GTS had already acknowledged detention, thanked Brar for helping at the difficult site, and offered additional money before the parties disputed the final amount.

76. The updated rate confirmation allocated $250.00 to detention and $150.00 to additional cost, confirming that the additional compensation was documented by GTS as an agreed rate adjustment rather than a unilateral seizure of freight.

77. Similarly, the accusation of "UNETHICAL OR DECEPTIVE BUSINESS PRACTICES" falsely portrays an ordinary, documented compensation dispute as dishonest conduct. Brar disclosed his position openly in writing, provided photographs and delivery information, and repeatedly documented the basis for the requested compensation.

**The Tarp and Empty-Container Disputes Do Not Make the Hostage Accusation True**

78. A separate dispute arose over whether AJFJ was responsible for re-tarping the open-top container after unloading. The original rate confirmation expressly stated that the driver was not responsible for loading or unloading, and Brar maintains that the unloading crew handled the tarp and did not reinstall it before he departed.

79. The parties also disputed the return timing for the empty container. Those issues may involve competing contractual positions, but they do not establish that Plaintiffs held cargo hostage, committed extortionate conduct, or engaged in deceptive business practices during delivery.

80. Defendants were free to dispute accessorial charges, seek an offset they believed contractually justified, or pursue an ordinary claim. They were not free to knowingly publish materially false factual accusations about Plaintiffs to an industry database in retaliation for a payment dispute.

**Defendants Published with Knowledge of Falsity or Reckless Disregard for the Truth**

81. Kilpatrick had first-hand knowledge of the entire transaction. He was the GTS employee communicating directly with Brar before, during, and after delivery and had access to the email chain, rate confirmations, POD communications, and GTS's internal payment records.

82. Before publication, Brar expressly informed Kilpatrick in writing that the hostage allegation was false and explained that the freight was being unloaded and had not been halted.

83. Before publication, GTS issued the revised $4,150.00 rate confirmation and accepted AJFJ's signed copy. Kilpatrick therefore knew GTS had itself agreed in writing to the $400.00 increase he later portrayed as improper coercion.

84. Kilpatrick also knew that the report's $500.00 figure was inaccurate. The final negotiated increase was $400.00, and GTS's own rate confirmation memorialized exactly $400.00 in additional compensation.

85. The timing further demonstrates malice. Kilpatrick threatened to use FreightGuard during the payment negotiations, asked Brar to articulate a response so Kilpatrick could "freight guard report" him, then published the report five days later after GTS had issued and received the signed revised rate confirmation.

86. GTS is independently responsible for the publication because the report was submitted under GTS's name and account by a senior operations employee acting on GTS's behalf. GTS personnel were copied on and participated in the underlying payment dispute, and GTS has maintained the report despite Plaintiffs' contemporaneous written response denying the allegations.

**<u>Carrier411 and FreightGuard Reports Materially Affect Carrier Selection</u>**

87. Carrier411 operates an industry carrier-vetting database used by freight brokers and shippers. Its FreightGuard system allows customers to report carriers based upon designated criteria, including "Held Load Hostage" and "In-Transit Agreement Modification."

88. Carrier411 expressly markets FreightGuard reports as information that helps brokers and shippers make carrier-selection decisions. A released report is associated with the carrier's MC number and can be seen by Carrier411 customers reviewing that carrier.

89. The reported carrier is given a limited opportunity to submit a response but cannot simply log into Carrier411 as a customer and remove the broker's report. Plaintiffs timely submitted a response denying the hostage allegation and explaining the difficult delivery conditions, detention, equipment damage, and rate-confirmation dispute.

90. The current FreightGuard report remains associated with AJFJ's MC number. Thus, prospective brokers conducting routine vetting encounter the accusation before deciding whether to tender a load to AJFJ.

**The FreightGuard Has Caused Specific Lost Loads and Continuing Business Damage**

91. After the FreightGuard was published, AJFJ began receiving denials from brokers who would not use AJFJ because of the report. Because freight opportunities move quickly, a single disqualification can cause AJFJ to lose both the rejected load and the opportunity to pursue other loads while trying to overcome the FreightGuard issue.

92. AJFJ has documented at least sixteen (16) specific load opportunities that it was denied after publication of the FreightGuard Report. The denied opportunities ranged in value from approximately $700.00 to $4,200.00 per load and included freight opportunities throughout the United States. Collectively, the documented denied load opportunities total approximately $37,300.00 in lost gross revenue. AJFJ also incurred approximately $270.00 in permit-related expenses associated with one of those lost opportunities.

93. Accordingly, AJFJ has presently documented at least approximately $37,570.00 in specific economic losses attributable to denied load opportunities following publication of the FreightGuard Report. These documented denials represent only a portion of the harm caused by Defendants' conduct. AJFJ has experienced additional rejected load opportunities that were not formally documented, has been forced to accept inferior freight opportunities, and has lost

additional business opportunities because brokers utilizing Carrier411 have declined or refused to do business with AJFJ as a result of the FreightGuard Report.

94. AJFJ reasonably anticipates identifying additional lost loads, customers, business relationships, and economic damages through discovery. The identities of the brokers and logistics providers associated with AJFJ's documented losses, together with supporting records concerning those lost opportunities, are maintained by AJFJ and may be produced in discovery as appropriate.

95. Once AJFJ learned that particular brokers would automatically decline AJFJ because of the FreightGuard, it became economically irrational to continue spending time repeatedly pursuing those brokers. AJFJ therefore lost additional opportunities that could not all be documented by a discrete rejection email or phone call.

96. AJFJ has also been forced to accept inferior freight options, deadhead farther, or forego loads that would otherwise fit its routes. Plaintiffs estimate the resulting lost revenue and business disruption at no less than approximately $75,000.00 to $100,000.00 and continuing, exclusive of reputational and punitive damages.

97. The publication has also damaged AJFJ's goodwill and standing within an industry in which trust between brokers and carriers is essential. The harm is ongoing because the FreightGuard remains accessible to brokers vetting AJFJ.

98. Brar has separately suffered injury to his professional reputation because Defendants did not publish only about an anonymous corporation; the report personally identifies "JASH BRAR" as the driver and dispatcher who allegedly held freight hostage and acted deceptively.

## CAUSES OF ACTION

### COUNT I
### Defamation - Libel Per Se
### (Against All Defendants)

99. Plaintiffs incorporate and re-allege each preceding allegation as if fully set forth herein.

100. Kilpatrick wrote and caused to be published on Carrier411 a FreightGuard report naming both AJFJ and Brar and communicating the report to Carrier411 and its broker/shipping customers.

101. The challenged statements include, without limitation, that Plaintiffs "HELD LOAD HOSTAGE"; engaged in "IN-TRANSIT AGREEMENT MODIFICATION" and "UNETHICAL OR DECEPTIVE BUSINESS PRACTICES"; and that Brar demanded additional money before finishing delivery and thereby held the load hostage.

102. These statements are factual or imply provably false facts. They are false for the reasons alleged above, including because the cargo was delivered to and actively being unloaded by the receiver; Brar expressly stated that no shipment was halted; GTS negotiated and agreed to additional compensation; and GTS issued a written $4,150.00 rate confirmation.

103. The statement that Brar demanded an extra $500.00 was also materially false. GTS's own final written rate confirmation increased the original rate by $400.00, not $500.00.

104. Kilpatrick published the statements knowing they were false or, at minimum, with reckless disregard for whether they were true. He possessed and participated in the contemporaneous communications that directly contradicted the hostage allegation and threatened the report before publishing it.

105. GTS is liable for Kilpatrick's publication because he acted within the course and scope of his employment and agency; used GTS's Carrier411 access; identified himself and GTS as the

submitter; and published the report for the purpose of GTS's brokerage business and carrier-management interests.

106. GTS further knew of, authorized, ratified, and maintained the publication through its employees and internal payment process, including after Plaintiffs expressly denied the hostage allegation and after GTS issued the revised written rate confirmation.

107. The challenged statements constitute defamation per se because they directly prejudice Plaintiffs in their profession and trade, impute a lack of honesty and integrity in the performance of their business, and accuse Plaintiffs of conduct reasonably understood in the freight industry as extortionate or dishonest misuse of entrusted cargo.

108. Because the statements are defamatory *per se*, injury to Plaintiffs' reputation is presumed under Virginia law. Plaintiffs have additionally suffered provable special damages, including lost loads, lost revenue, and impaired business relationships.

109. Defendants acted with actual malice. Their misconduct was willful, wanton, retaliatory, and undertaken with knowledge of falsity or reckless disregard for the truth, entitling Plaintiffs to punitive damages in the amount permitted by law.

**COUNT II**
**Tortious Interference with Business Relationships and Expectancies**
**(Against All Defendants)**

110. Plaintiff AJFJ incorporates and re-alleges each preceding allegation as if fully set forth herein.

111. AJFJ had valid existing business relationships and reasonable business expectancies with freight brokers throughout the United States, including repeat brokers and specific brokers from whom AJFJ sought and reasonably expected to obtain loads in the ordinary course of its business.

112. Defendants knew that AJFJ depended upon broker relationships and prospective load bookings. Indeed, GTS itself was acting as a freight broker and knew precisely how Carrier411 and FreightGuard reports are used to vet and disqualify carriers.

113. Defendants intentionally interfered with AJFJ's business relationships and expectancies by publishing false factual accusations on the very database used by brokers to decide whether to transact with AJFJ.

114. Defendants employed improper methods, including defamation, knowingly false factual accusations, threats to use Carrier411 as leverage in a payment dispute, and malicious publication after AJFJ had expressly advised Defendants that the hostage accusation was false.

115. The interference had its intended and foreseeable effect. Brokers denied AJFJ specific loads after reviewing the FreightGuard, and AJFJ lost existing and prospective business opportunities as a result.

116. AJFJ has documented at least approximately $37,570.00 in specific denied-load and related losses and has suffered broader revenue loss estimated at $75,000.00 to $100,000.00 and continuing.

117. Defendants' conduct was willful and malicious and supports an award of punitive damages sufficient to punish and deter similar misuse of an industry reporting system, subject to the limits imposed by Virginia law.

**COUNT III**
**Vicarious Liability and Ratification**
**(Against GTS)**

118. Plaintiffs incorporate and re-allege each preceding allegation as if fully set forth herein.

119. At all relevant times, Kilpatrick was an employee and agent of GTS and held the title of Director of Operations and Senior Account Manager. Kilpatrick negotiated the AJFJ load,

administered the delivery, communicated on GTS email, directed GTS employees concerning rate-confirmation changes, communicated with GTS payables, and submitted the FreightGuard report in GTS's name.

120. The acts complained of were naturally incident to Kilpatrick's work for GTS and were undertaken, at least in part, to further GTS's business interests in administering the load, managing a carrier dispute, and reporting a carrier through GTS's Carrier411 account.

121. GTS is therefore vicariously liable for Kilpatrick's defamatory publication and tortious interference under the doctrine of respondeat superior.

122. GTS also ratified the conduct. The FreightGuard was submitted as a GTS report; GTS personnel were involved in the same payment dispute; a GTS email address was copied on the FreightGuard notice; and GTS has not withdrawn or corrected the report despite the contemporaneous evidence contradicting the hostage allegation.

123. As a direct and proximate result of Kilpatrick's conduct within the course and scope of his agency, and GTS's ratification thereof, Plaintiffs suffered the damages alleged herein.

**COUNT IV**
**Injunctive Relief**
**(Against All Defendants)**

124. Plaintiffs incorporate and re-allege each preceding allegation as if fully set forth herein.

125. The FreightGuard report remains associated with AJFJ's MC number and continues to impair AJFJ's ability to obtain freight and Brar's professional reputation.

126. Money damages alone are inadequate to prevent future brokers from seeing and relying upon the false factual accusations because every new broker that encounters the report presents another risk of a lost business opportunity that is difficult to identify and quantify after the fact.

127. Defendants can take steps within their control to retract, delete, correct, or otherwise designate the FreightGuard report as withdrawn or resolved and can refrain from republishing the same false factual accusations.

128. After final adjudication that the challenged factual statements are false and defamatory, a narrowly tailored injunction requiring Defendants to take available steps to withdraw the report and prohibiting republication of the adjudicated false statements would prevent continuing irreparable injury without restricting truthful speech or lawful opinion.

129. The balance of hardships favors Plaintiffs because Defendants have no legitimate interest in maintaining or republishing factual statements adjudicated to be false, while Plaintiffs continue to suffer injury to reputation, goodwill, and business relationships for so long as the report remains available to prospective brokers.

## RESERVATION OF RIGHTS

Plaintiffs allege the foregoing based upon personal knowledge, contemporaneous communications, records in their possession, public records, and information reasonably available before discovery. Substantial additional evidence concerning GTS's Carrier411 account, the internal decision to publish and maintain the FreightGuard, GTS's members and citizenship, broker vetting records, lost-load causation, and Defendants' internal communications is in Defendants' or third parties' possession. Plaintiffs reserve the right to amend this Complaint upon a reasonable opportunity for discovery.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, the premises considered, Plaintiffs respectfully request that this Honorable Court:

A. Enter judgment in favor of Plaintiffs and against Defendants, jointly and severally where applicable;

B. Award Plaintiffs compensatory, presumed, general, special, and consequential damages in an amount to be proven at trial and in excess of $75,000.00;

C. Award punitive damages based upon Defendants' willful, malicious, and knowing misconduct, up to the maximum amount ($350,000) permitted by Virginia law;

D. After adjudicating the challenged factual statements to be false and defamatory, permanently enjoin Defendants from republishing those adjudicated false statements and require Defendants to take all steps reasonably available to them to withdraw, retract, or cause the FreightGuard report to be designated as withdrawn or removed to the maximum extent permitted by Carrier411;

E. Award pre-judgment and post-judgment interest as permitted by law, together with taxable costs;

F. Award Plaintiffs their attorney fees pursuant to *St. John v. Thompson*, 299 Va. 431, 435, 854 S.E.2d 648, 651 (2021); see also, *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92 (1999); and

G. Grant such other and further relief as the Court deems just and proper.

Dated: September 30, 2026, Respectfully submitted,

By: ____/s/ Robert Powers________
Robert Powers, Esq.
MCCLANAHAN POWERS, PLLC

3160 Fairview Park Drive, Suite 410
Falls Church, VA 22042
Telephone: (703) 520-1326
Facsimile: (703) 828-0205
Email: rpowers@mcplegal.com
ldavis@mcplegal.com
*Counsel for Plaintiffs*

**VERIFIED COMPLAINT - VERIFICATION**

State of Texas )
County of Kaufman )

JASHMEEN SINGH BRAR, being duly sworn, deposes and states:

I am a Plaintiff in this action and the Operations Manager and an officer of AJFJ Transport Corporation. I have read the foregoing Verified Complaint and know its contents. The factual allegations are true based upon my personal knowledge, except as to matters stated upon information and belief, and as to those matters I believe them to be true. My knowledge, information, and belief are derived from my personal involvement in the shipment and communications described in the Complaint, my position with AJFJ, my review of AJFJ's business records, and my review of the documents and records relating to the FreightGuard report and resulting lost business.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 25, 2026.

Jashmeen Singh Brar
JASHMEEN SINGH BRAR